UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE NEW YORK AND PRESBYTERIAN
HOSPITAL,

                      Petitioner,

                v.

NEW YORK STATE NURSES ASSOCIATION,

                      Respondent.

24-CV-9865 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Before the Court are dueling motions—a petition by New York and Presbyterian Hospital (the "Hospital") to vacate an arbitration award (the "Award") pursuant to 9 U.S.C. § 10 of the Federal Arbitration Act ("FAA") and 29 U.S.C. § 185(a) of the Labor Management Relations Act ("LMRA") entered in favor of the New York State Nurses Association (the "Union") due to understaffing in one of its departments, and the Union's cross-motion to confirm that same award. For the reasons that follow, the Hospital has not met the high standard for vacating an arbitral award. Accordingly, the Court denies the Hospital's petition to vacate the Award and grants the Union's cross-motion to confirm it.

## BACKGROUND

The following facts are drawn from the parties' papers and the underlying Award and are not in dispute unless otherwise noted. *See AFK Inc. v. Skybell Techs. Inc.*, 772 F. Supp. 3d 473, 476 (S.D.N.Y. 2025). The Hospital is a "not-for-profit corporation that operates an academic medical center with several campuses." Dkt. No. 1 ("Pet.") ¶ 3. One such unit is New York-Presbyterian Allen Hospital (the "Allen Emergency Department" or the "Allen ED"), a "community-based emergency care center," *id.* ¶ 7. The Union is a labor organization representing

registered nurses employed by the Hospital. *Id.* ¶ 4.

## I. The Agreement

Six years ago, the parties entered into a collective bargaining agreement. *See* Pet. ¶ 6; Dkt. No. 7, Ex. B (the "CBA"). They then executed a Memorandum of Agreement, *see* Dkt. No. 7, Ex. C (the "MOA"), effective January 1, 2023, modifying the CBA, and extending it through December 31, 2025. Dkt. No. 7, Ex. D at 6.

Section 3.04 of the CBA, as modified by the MOA (together, the "Agreement"), charges the Hospital with maintaining certain nursing staffing levels in the Allen ED, as outlined by a staffing grid (the "Grid").[1] CBA § 3.04(10) ("The [Hospital] agrees to maintain the number of nurses per unit per shift reflected in the improvement grids."). Unlike the agreements established for other hospital units, the "grid for Allen ED does not impose any nurse-patient staffing ratios or set any maximum number of patients that an RN may be assigned." Pet. ¶ 14; *N.Y. & Presbyterian Hosp. v. N.Y. State Nurses Ass'n*, No. 24-CV-5648, 2024 WL 5107586, at *1 (Dec. 13, 2024) (hereinafter *N.Y.P. I*) (emphasis in original) (discussing staffing grid that set nurse-patient staffing ratios).

The Agreement also established the Allocation Committee (the "Committee"), "consisting of members of the [Union's] Executive Committee," along with "members of nursing leadership," to re-assess the staffing grid annually and resolve disputes that arose. CBA § 3.04(4). If the Union believed that the Hospital had violated any provision in Section 3.04—including a "perceived persistent failure to post, recruit for or hire nurses expeditiously" or a "perceived pattern of violations of the number of nurses per unit per shift reflected in the grids"—it could raise this to the Committee. *Id.* § 3.04(12). If the Committee was unable to resolve the dispute, the parties

---

[1] Section 3.04 of the Agreement provided for a staffing grid, understood to represent the Hospital's commitment "to recruit for and hire nurses to fill currently vacant budgeted RN positions." Agreement § 3.04.

would be referred to mediation and if that failed, to arbitration. CBA §§ 3.04(6), (12); *see also* MOA § 3.04(7).[2] The Agreement provided that "[t]he arbitrators hearing disputes unresolved by the Allocation Committee [would] have the same remedial authority as an arbitrator under the Agreement." Agreement § 3.04(7). It further specified that, "[t]he arbitrator [would] not have any power to add to or subtract from or otherwise amend this Agreement," *id.* § 14.07, and that the "arbitrator's decision [would] be final and binding on the parties." *Id.* § 14.06.

## II.   The Arbitration

Against this backdrop, in June 2023, the Union filed a grievance alleging that the Hospital had failed to comply with the Agreement's minimum staffing requirements in the Allen ED throughout 2023. *See* Pet. ¶ 19. A few months later, the Union filed its demand for arbitration. *See* Dkt. No. 7, Ex. D. It sought, in pertinent part, compliance with the Grid by hiring, scheduling, and staffing a sufficient number of nurses, the issuance of a cease-and-desist, *id.*, and to be made whole by requiring the Hospital to pay "the amount of money [it] would have paid to the number of extra nurses needed to properly staff the shift." Dkt. No. 7, Ex. A ("Award") at 27–28. The Hospital "denied that it violated the Agreement," claiming to have offered "ample evidence of its good faith efforts to upstaff to satisfy the staffing grid and the obstacles that it faced that were a consequence of market conditions for nursing staff in the area." Pet. ¶ 22; *see also* Award at 30–36. The Hospital also took issue with the Union's proposed remedy, characterizing it as (1) in excess of the Arbitrator's authority pursuant to Sections 3.04 and 14.07 of the Agreement, (2) in violation of public policy against punitive awards, and (3) irrational. *See* Pet. ¶¶ 30–39; Award at 34.

On September 25, 2024, the Arbitrator entered his decision in favor of the Union. While

---

[2] This subsection is enumerated differently in the CBA and MOA, but refers to the provision entitled "Resolving Allocation Committee Disputes." Hereinafter, it will be referred to as Agreement § 3.04(7), since this is the way the parties most commonly refer to it.

3

recognizing the "Hospital's efforts to minimize staff shortages," Award at 53, he found that the Hospital had violated the staffing requirements in Section 3.04 143 times out of the 567 alleged, finding "evidence of excessive workload, unsafe working conditions, or burnout." *Id.* at 55.

### III. The Award

Having found that the Hospital violated the Agreement, the Arbitrator proceeded to award "three vacation days for each full-time regular Allen ED RN." *Id.* at 54. He grounded his authority in Sections 3.04(7) and 14.07 of the Agreement. *Id.* at 39–43. Section 3.04(7) provides that "arbitrators hearing disputes unresolved by the Allocation Committee shall have the same remedial authority as an arbitrator under the Agreement." Agreement § 3.04(7). That authority is limited by Section 14.07, which states that the arbitrator "shall not have any power to add to or subtract from or otherwise amend this Agreement." Agreement § 14.07. The Arbitrator noted that Section 3.04(7) reflected recently negotiated language, in which the parties agreed to "new remedies" and "expand[ed] the remedy provisions in staffing disputes in Section [3.04(7)]." *Id.* 54.

The Arbitrator rejected the Hospital's argument that the Award was punitive, stating that, "Compensating a nurse for excessive workload is not a penalty or punitive award giving nurses additional pay." *Id.* at 54. He rejected Petitioner's proposed remedy of simply ordering the Hospital to cease-and-desist its "pattern of staffing violations on the Allen ED," *id.* at 56, as "unjust and unfair." *Id.* at 54. Dividing the 143 violations by the 47 nurses who worked understaffed shifts in the Allen ED, he found that this approximated three shifts per nurse, and that "[d]ue to the unique patient flow and unequal, irregular, and unusual staff assignments on this unit, the appropriate remedy is three vacation days for each full-time regular Allen ED RN." *Id.* The goal of the Agreement, and the purpose of the remedy, he reasoned, was to "avoid excessive workloads, prevent burnout, and improve retention." *Id.*

4

**LEGAL STANDARD**

"[A] federal court's review of labor arbitration awards is narrowly circumscribed and highly deferential—indeed, among the most deferential in the law." *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 532 (2d Cir. 2016). In the context of labor disputes, the Second Circuit has held that it is Section 301 of the LMRA, and not the FAA, that governs. *See id.* at 545 n.13; 29 U.S.C. § 185(a); *see also United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 n.9 (1987).[3] Because "the LMRA imposes 'materially the same' standard for review of an arbitral award as does the Federal Arbitration Act," however, "cases decided under the FAA are . . . instructive in the LMRA context." *Unite Here Loc. 100 v. Westchester Hills Golf Club, Inc.*, 161 F. Supp. 3d 262, 264 (S.D.N.Y. 2016).[4]

In reviewing such an award, courts "inquire only as to whether the arbitrator acted within the scope of his authority as defined by the collective bargaining agreement." *Nat'l Football League Mgm't Council*, 920 F.3d at 536. Courts are "not permitted to substitute their own," judgment for the arbitrator's, and it is the "arbitrator's construction of the contract and assessment of the facts that are dispositive, 'however good, bad, or ugly.'" *Id.* (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 573 (2013)). A court may therefore vacate an arbitrator's award only when the arbitrator was acting outside the scope of his authority or not following the "plain language of the contract." *Id.* at 537 (quoting *Misco*, 484 U.S. at 38). Even "failure to 'follow

---

[3] Unless otherwise indicated, this memorandum opinion and order omits all internal quotation marks, citations, footnotes, omissions, emphases, and alterations in quoted text.

[4] There is little if no daylight between the two statutes when deciding motions to vacate and confirm arbitration awards. *See Loc. Union No. 1 of the United Ass'n of Journeymen and Apprentices of the Plumbing and Pipe Fitting Indus. of the U.S. & Can. v. Bass Plumbing & Heating Corp.*, No. 13-CV-3837, 2015 WL 1402884, at *6 (E.D.N.Y. Mar. 25, 2015) ("However, a number of courts have expressly permitted the FAA to serve as a guide in LMRA matters involving petitions to confirm arbitration awards . . . . [I]n this arena, the FAA/LMRA dichotomy ultimately yields a distinction without a difference.").

arbitral precedent' is no 'reason to vacate an award.'" *Id.* (quoting *Wackenhut Corp. v. Amalgamated Loc. 515*, 126 F.3d 29, 32 (2d Cir. 1997)).

The key question before the Court is "whether the arbitrator's award draws its essence from the collective bargaining agreement, since the arbitrator is not free merely to dispense his own brand of industrial justice." *Wackenhut Corp.*, 126 F.3d at 31 (quoting *Saint Mary Home, Inc. v. Serv. Emps. Int'l Union, Dist. 1199*, 116 F.3d 41, 44 (2d Cir. 1997)). Courts have interpreted the essence of the agreement doctrine to "require[] the moving party to make a persuasive showing that the arbitrators' interpretation is contrary to the plain language of the contract." *Sanluis Devs. LLC v. CCP Sanluis, LLC*, 498 F. Supp. 2d 699, 704 (S.D.N.Y. 2007). If the arbitrator offered "even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result." *Int'l Bhd. of Elec. Workers, Loc. 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 717 (2d Cir. 1998) (hereinafter *Niagara Mohawk I*).

A court may also vacate an arbitration award on public policy grounds, though this authority is "narrowly circumscribed to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant . . . and not from general considerations of supposed public interests." *Saint Mary Home*, 116 F.3d at 45. A party seeking vacatur on this ground must "demonstrate that the policy is one that specifically militates against the relief ordered by the arbitrator." *Niagara Mohawk I*, 143 F.3d at 716 (emphasis omitted). And while courts are empowered to evaluate whether "enforcement of an award would violate public policy," that authority does not permit courts to disagree with the arbitrator's judgment about the proper remedy to be awarded in a given case. *Loc. 97, Int'l Bhd. of Elec. Workers, A.F.L.-C.I.O v.*

6

*Niagara Mohawk Power Corp.*, 196 F.3d 117, 125 (2d Cir. 1999) (hereinafter *Niagara Mohawk II*).

**DISCUSSION**

Before the Court are cross motions to vacate and confirm the Award. For the reasons discussed below, the Hospital's motion to vacate the Award is denied and the Union's motion to confirm it is granted.

In challenging the Award, the Hospital does not contest that the underlying dispute was arbitrable. Nor could it, given the expansive language in the Agreement, mandating that such disputes be submitted to arbitration if they could not be resolved by other alternative dispute resolution mechanisms. *See* Agreement §§ 3.04(7), 14.06; CBA §§ 3.04(12)–(13). Its challenge instead boils down to whether the Arbitrator awarded a remedy that legally he could not. The Hospital asserts that the Award should be set aside on three grounds. First, it argues that the Award, which was framed as compensatory, was actually punitive, and thus in violation of public policy. Dkt. No. 8 ("Hosp.'s Br.") at 13–22. Second, it maintains that the Arbitrator exceeded the authority granted to him by the Agreement. *See* Hosp.'s Br. at 23–29. Finally, the Hospital asserts that, in awarding three vacation days per nurse, the Award was irrational—serving to worsen the Hospital's nursing staffing shortages and failing to account for which nurses were actually overworked on understaffed shifts since the Grid lacked a nurse-to-patient staffing ratio. *See* Hosp.'s Br. at 29–30.[5] The Court disagrees, finding that the Award is compensatory, not punitive, in nature, within the Arbitrator's authority, and sufficiently rational to withstand vacatur.

---

[5] In its Petition, the Hospital asserts that the "Arbitrator's conclusion that the CBA was violated also is irrational," since the Arbitrator "provides no explanation [as to] how [he] reached his conclusion that 143 violations occurred, solely on midshift . . . ." Pet. ¶ 39. The Hospital submits no additional briefing on this point in its supporting papers. Nevertheless, the Court finds that the Arbitrator sufficiently justified his finding of the underlying violation. *See e.g.*, Award at 55 ("Of the 567 alleged violations, considering mitigating factors, I found 143 on the above dates and shifts. Violations on these dates are supported by credible witness testimony, POAs, and a statistical grid violation.").

7

### I. Whether the Award Violated Public Policy

Arbitral awards can be vacated if they are in violation of public policy. "[A] court's authority to refuse to enforce an arbitral award on public policy grounds is narrowly circumscribed 'to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant . . . ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *See e.g.*, *Saint Mary Home, Inc.*, 116 F.3d at 45–47 (quoting *Misco*, 484 U.S. at 43). The Hospital argues that one such situation arises when an arbitral award issued under the LMRA is punitive, relying on *Garrity v. Lyle Stuart, Inc.*, 386 N.Y.S. 2d 831 (N.Y. 1976), for the proposition that under New York law, arbitral awards cannot be punitive unless the parties have explicitly agreed to it. The holding in *Garrity*, however, was preempted by the FAA in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, in which the Supreme Court held that there was a presumption that arbitral awards could be punitive unless the parties agreed otherwise. 514 U.S. 52, 56 (1995); *Martin v. SCI Mgmt. L.P.*, 296 F. Supp. 2d 462, 469 (S.D.N.Y. 2003) ("[T]he FAA preempts the *Garrity* rule unless the parties expressly intend to preclude the arbitrator from awarding punitive damages."). No court, however, appears to have directly addressed whether *Mastrobuono* applies in an LMRA dispute, *cf. Monaco v. Smith*, No. 00 Civ. 5845, 2004 WL 203009, at *5 (S.D.N.Y. Feb. 2, 2004) (holding, post-*Mastrobuono*, that the LMRA prohibits punitive damages). So for purposes of these motions, the Court assumes without deciding that there is "a well-defined public policy against punitive arbitration awards," under New York State Law as well as Section 301 of the LMRA. *See N.Y.P. I*, 2024 WL 5107586, at *5.

The Hospital first contends that the arbitral award in this LMRA case is punitive, not compensatory, and that punitive awards violate federal and state labor law and contravene public

8

policy. Hosp.'s Br. at 14–17. The Court disagrees. The Hospital's main argument is that because the Award fails to remedy an actual, compensable harm, it must be punitive. Since the nurses were already paid overtime for their understaffed shifts, the Hospital argues, any remedy beyond ordering the Hospital to cease-and-desist from violating the staffing provisions of the Agreement would constitute a windfall for the Union. Hosp.'s Br. at 20 ("[T]hey were paid their full contractually guaranteed wage for each and every shift that the Arbitrator found at issue."); *see also* Dkt. No. 20 ("Hosp.'s Reply") at 11 ("At the risk of relentless repetition, no [Union] member, or [the Union] itself, lost a single dollar to the purported understaffing."). The Hospital further characterizes the Award as punitive because it makes nurses "better off than they would be if the CBA had not been violated," and was not calibrated to the precise amount of overwork experienced by any individual nurse, but instead was awarded to all "nurses in the Allen ED, without regard to how many shifts they worked that were understaffed." Hosp.'s Br. at 20. In the Hospital's view, the relevant inquiry is whether the harm alleged is non-economic; it contends that the damages here, while framed as compensatory, reward a non-economic injury and are thus punitive.

The Second Circuit, despite not having ruled on this precise issue, has not restricted arbitral awards to purely economic losses. Instead, it has left open the possibility that arbitrators can award remedies for such non-monetary harms. In *Hygrade Operators, Inc. v. Local 333, United Marine Division* for instance, the Circuit confirmed an award of monetary damages to a union despite a lack of economic injury, namely a violation of a "no lockout" provision, which protects union members from employers withholding work to gain concessions during the bargaining process for a new agreement. 945 F.2d 18, 19, 24 (2d Cir. 1991). The arbitrator in *Hygrade* found that despite the fact that "expelled employees were paid" for the days of the lockout, the union was entitled to monetary damages, stating, "Although no evidence of *monetary damages* was adduced, there

9

certainly was much expense caused to the Union." *Id.* at 21 (emphasis added). That unquantifiable "expense" included a "weaken[ing of] the Union's bargaining position both at the juncture of the ongoing labor controversy and in the aftermath." *Id.* at 24. Although the court noted that the arbitrator was free to conclude that this weakened bargaining position may have resulted in "economic damage to the Union," *id.*, the award was made in the absence of actual, quantifiable monetary loss. *Id.* at 21.

Approximately one year ago, the parties here engaged in another litigation regarding failure to comply with a nearly identical collective bargaining agreement concerning the Cardiothoracic Intensive Care Unit at New York Presbyterian. *See N.Y.P. I*, 2024 WL 5107586, at *5; Dkt. No. 15 ("Union's Br.") at 3. There, the court rejected the Hospital's argument that the award granted—in that case, a monetary award—was punitive and thus violated public policy. *N.Y.P. I*, 2024 WL 5107586, at *4–5. Instead, the court found that, although the nurses were financially compensated for their increased workload, they were still entitled to monetary damages. *Id.* at *5 ("In sum, the Court finds that the Award is not clearly punitive because the Arbitrator made specific factual findings regarding the RNs' harms and tailored a monetary remedy to compensate for those harms."). The award, the court found, was specifically tailored to nurses who had worked an understaffed shift, acknowledged the Hospital's "good faith efforts" to comply with staffing provisions of the agreement, and ultimately "served as compensation to the nurses for the adverse conditions under which they worked, and not [as] a penalty to the Hospital." *Id.* at *5. The same is true of the Award here.

The Hospital argues that other circuits, most notably the Fourth Circuit, have held that even when an award is characterized as compensatory, if it remedies non-monetary loss, it should be vacated as punitive. *See Westinghouse Elec. Corp. Aerospace Div. v. Int'l Bhd. of Elec. Workers,*

10

*AFL-CIO* 561 F.2d 521, 523–24 (4th Cir. 1977). The Hospital relies heavily on *Westinghouse*, in which a union challenged a "vacation shutdown," a practice where union members are forced to take vacation outside of their discretionary time off. *Id.* at 522; Hosp.'s Reply at 8 ("The seminal authority here is *Westinghouse Electric Corp.* . . . a case on all fours with the Award here."). The arbitrator there agreed with the union and awarded vacation days to employees who had scheduled their vacation before the challenged vacation shutdown. The Fourth Circuit affirmed vacatur of the award, finding that since no employee suffered monetary loss, the award was punitive and therefore in violation of public policy. In so doing, it held that "[w]ith respect to vacation shutdowns, compensatory damages may be awarded only when a breach of the bargaining agreement causes a monetary loss." *Id.* at 523. A few years later, in *Baltimore Regional Joint Board v. Webster Clothes, Inc.*, the Fourth Circuit extended the *Westinghouse* holding beyond vacation shutdowns, stating that, "[i]t is clear that in order to be entitled to compensatory damages for contract breach, a party must have suffered some legally cognizable loss, be it manifestly monetary or measurable in monetary terms." 596 F.2d 95, 98 (4th Cir. 1979).[6]

The Court rejects the Hospital's framing that damages are necessarily punitive when they address non-monetary harms. Indeed, not even in *Westinghouse* or *Baltimore* does the Fourth Circuit expressly circumscribe compensatory damages in quite that way. In *Baltimore*, the court states that, "[i]t is clear that in order to be entitled to compensatory damages for contract breach, a

---

[6] The Second Circuit has recognized this line of caselaw twice in dicta, and while it has not explicitly rejected it, it has never affirmatively adopted it either. In a footnote in *The Corporate Printing Co. v. N.Y. Typographical Union No. 6*, the court, in finding the damages awarded to be compensatory rather than punitive, affirmed that the employees "suffered measurable monetary loss" due to the employer's "refusal to fund their . . . benefits," No. 86-CV-1762, 1990 U.S. Dist. LEXIS 8591, at *27 n.5 (S.D.N.Y. July 13, 1990). And in *Leed Architectural Prods., Inc. v. United Steelworkers of Am., Loc. 6674*, the court held that an arbitrator's decision to increase the "bargained for wages of the four grievants," went beyond his express authority – and not that compensatory damages for non-monetary harm was punitive. 916 F.3d 63, 67 (2d Cir. 1990). Neither case turned on whether the harm incurred by the union was monetary or non-monetary.

11

party must have suffered some *legally cognizable loss*, be it manifestly monetary or *measurable in monetary terms*." *Baltimore*, 596 F.2d at 98 (emphases added). And the court in *Westinghouse* acknowledged that none of the employees had testified that they "suffered any monetary loss, *inconvenience or hardship.*" *Westinghouse*, 561 F.2d at 524 (emphases added).

Even if this Court were to adopt the more restrictive test used by the Fourth Circuit, the Award still survives. First, the non-monetary harm here is measurable in monetary terms. The Union's proposed monetary remedy, for one, demonstrates how the Hospital's violation of the Agreement's staffing provisions could be quantified. Multiplying the number of violations by the contractual nurse shift rate would have approximated "the amount of money the Hospital would have paid to the number of extra nurses needed to properly staff the shift." *Id.* at 25–28; *see also N.Y.P. I*, 2024 WL 5107586, at *5 ("The Court will not second-guess the Arbitrator's judgment . . . that this was a reasonable estimate of the monetary value of the additional burden placed on the nurses during the understaffed shifts."). Furthermore, while individual nurses may have been reimbursed for the understaffed overtime shifts they worked, had the Union understood the risk that the Hospital would not comply with its staffing provisions and that its nurses would have been working under significantly harsher conditions, it may well have bargained for additional financial benefits for its members. Thus, there could also be a "resultant economic damage to the Union," and its individual members. *See Hygrade Operators, Inc.* 945 F.2d at 24.

Second, while the nurses may not have suffered a monetary loss, they did suffer inconvenience and hardship, harms referenced by the court in *Westinghouse*, even though the plaintiffs there had not suffered either injury. 561 F.2d at 523–24. The Hospital attempts to dispense with this injury, characterizing it as "emotional distress," which it argues, cannot be remedied by contract, adding that the LMRA does not permit remedies "for the abstract notion of

'overwork.'" Hosp.'s Br. at 19–20. The Union, however, does not seek damages for emotional distress or for overwork in the abstract, but for harms stemming from a violation of a provision in the collective bargaining agreement. The inconvenience and hardship suffered by the 47 nurses over the course of the year therefore qualifies as a cognizable harm.

Furthermore, the Hospital's payment of the nurses does not render the Award superfluous or merit its vacatur. The Hospital insists that since it already paid the nurses for each shift they worked, there is nothing left to compensate the nurses for. But it is a contractual expectation that the nurses are paid for their labor. *See* Agreement § 6.03 ("Premium Compensation Rate: Overtime Work"). Like in *N.Y.P. I*, "[t]he Arbitrator's Award was not structured to compensate for deficient wages but instead to compensate the nurses for working under the adverse conditions of an understaffed shift." 2024 WL 5107586, at *5.

Perhaps the stronger argument, as the Union urges, *see* Union's Reply at 6, is not based in a distinction between monetary and non-monetary harms, but in whether the harm was causally linked to the breach of the collective bargaining agreement or to the remedy itself. *See e.g.*, *Ga. Power Co. v. Int'l Bhd. of Elec. Workers, Loc. 84*, 995 F.2d 1030, 1032 (11th Cir. 1993) ("For the damage award to be validly compensatory, there must be a causal relationship between the Company's breach of the Agreement and the loss claimed by the Union."). In *Industrial Mutual Associated, Inc. v. Amalgamated Workers, Local Union No. 383*, the Sixth Circuit denounced the approach taken in *Westinghouse* and *Baltimore*, finding it "more straightforward" when assessing whether monetary awards were punitive or not to assess whether the award "bear[s] a logical relationship," to the harm incurred. 725 F.2d 406, 412 & n.2 (6th Cir. 1984). Were the Court to follow the approach of these circuits here, the Award would pass muster as there is a clear causal relationship between the Hospital's violation of Section 3.04 of the Agreement through

13

understaffing and increased workloads for registered nurses, and the Award of vacation days to those nurses. The Arbitrator explicitly connected the Award to the injury incurred, stating, "I found a pattern of staffing violations on the Allen ED, which negatively impacted the nurses assigned to that unit by creating increased workloads." Award at 56. "Compensating a nurse for excessive workload," he continued, "is not a penalty or punitive award . . . When the parties agreed to new remedies, they created an additional benefit to ensure safe working conditions, avoid excessive workloads, prevent burnout, and improve retention." *Id.* at 54.

At its core, the purpose of punitive damages is to punish—specifically, to punish "egregious, reprehensible behavior." *Virgilio v. City of New York*, 407 F.3d 105, 116 (2d Cir. 2005). "Although punitive damages must have some relationship to the conduct for which the punishment is imposed, they do not seek to make the injured victim whole," as the Arbitrator did here. *Id.* at 117. Like in *N.Y.P. I*, the Arbitrator's Award was designed "to compensate the nurses for working under the adverse conditions of an understaffed shift." 2024 WL 5107586, at *5. The Arbitrator did not merely express his intent that the damages be compensatory in nature, Award at 54, he articulated an underlying rationale aimed at compensating the nurses for their hardship, stating, "To have negotiated contractual language for modifying staffing grids," and to have "expand[ed] the remedy provisions in staffing disputes," and then to "find[] a violation but award[] no remedy other than a cease and desist is unjust and unfair." Rather than "purport[ing] to punish the Hospital for its behavior," *see N.Y.P. I*, 2024 WL 5107586, at *5, the Arbitrator here sought to identify a sustainable and fair solution for both parties, accounting for the Hospital's "good faith efforts to mitigate the excessive workloads," by "anticipat[ing] callouts and sickouts," Award at 55–56, and recognizing the inconvenience and hardship faced by the nurses staffing the Allen ED. He did so in the course of a fifty-six-page Award, which grappled with the contours of the

14

Agreement, his own role and authority as an arbitrator, the real-world constraints the Hospital was confronted with, and the excessive workloads shouldered by the nurses for the better part of a year. His Award was not divorced from the law, the Agreement, or the circumstances of the parties before him. The Hospital may not agree with the ultimate decision, but the Court is satisfied that the Award does not conflict with any other laws or contravene public policy.

## II. Whether the Arbitrator Exceeded His Authority

The Hospital next argues that the Arbitrator exceeded his authority under the Agreement by awarding vacation days that were not authorized by the Agreement and in "express" disregard of Section 14.07, which forbids the Arbitrator from "add[ing] to or subtract[ing] from or otherwise amend[ing]," the Agreement. Hosp.'s Br. at 23. Because the Arbitrator ignored the plain contractual language, the Hospital maintains, the Award must be set aside. The Union responds that the Agreement endowed the Arbitrator with "extensive remedial authority," and "because no other provision in the CBA expressly limit[ed] that authority or otherwise preclude[d] make-whole relief," the Arbitrator's decision should stand. Union's Br. at 3. The Court agrees with the Union.

"Under our heightened standard of deference, vacatur . . . is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that is not even arguably derived from the contract." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 222 (2d Cir. 2002); *see also Misco*, 484 U.S. at 38 ("[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."). Furthermore, arbitrators are given a wide berth when crafting a suitable remedy absent a limiting contractual provision that narrows their authority. The Supreme Court in *Misco* stated that "where it is contemplated that the arbitrator will determine remedies for contract

15

violations that he finds, courts have no authority to disagree with [his] honest judgment in that respect." *Misco*, 484 U.S. at 38. Even if an "arbitral decision is not based on the express terms of a collective bargaining agreement," it "does not mean that it is not properly derived from the agreement." *Allied Int'l Union v. Tristar Patrol Servs., Inc.*, No. 6 Civ. 15515, 2007 WL 2845227, at *3 (S.D.N.Y. Sept. 26, 2007) (quoting *Harry Hoffman Printing v. Graphic Comm. Int'l Union, Loc. 261*, 950 F.2d 95, 98 (2d Cir. 1991)).

The Agreement explicitly states that the Arbitrator has the "same remedial authority as an arbitrator under the Agreement." Agreement § 3.04(7). Like in *N.Y.P. I*, which dealt with a similar Agreement, the Arbitrator here "was justified in finding that the [Agreement] does not contain limitations on that remedial authority," in contrast to an earlier agreement entered into by the parties, which did include a provision that limited an arbitrator's authority. *See* 2024 WL 5107586, at *6; Hosp.'s Br. at 24. The Hospital, pointing to the absence of any specific remedies, "interprets said silence narrowly to the effect that an arbitrator has no authority to grant the aforementioned remedies." *Allied Int'l Union*, 2007 WL 2845227, at *4. But, confirmation of the Award would only be improper "if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract." *Westerbeke Corp.*, 304 F.3d at 222. There are no such conflicts here.

Additionally, Section 14.07, which states that "[t]he arbitrator shall not have any power to add to or subtract from or otherwise amend this Agreement," does not limit the Arbitrator's authority in the way the Hospital contemplates. *See N.Y.P. I*, 2024 WL 5107586, at *6 ("The standard MOA provision forbidding the Arbitrator from 'add[ing] to or subtract[ing] from or otherwise amend[ing]' the Agreement does not undermine the Arbitrator's authority to impose a monetary award here."). If the Hospital's "interpretation were correct, the CBA's arbitration

16

provision would be rendered entirely superfluous because the arbitrator would have no explicit authority to award any remedy." *Allied Int'l Union*, 2007 WL 2845227, at *4. Indeed, the Supreme Court has held that arbitrators must be allowed to "fashion the most appropriate remedy under the circumstances." *Id.* (citing *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). As such, the Court finds that neither Section 3.04(7) nor Section 14.07 restrict the Arbitrator's authority so as to warrant vacatur of the Award.

The Hospital further insists that ordering it to cease-and-desist from violating the staffing provision is the only acceptable remedy, suggesting that a cease-and-desist is a contractually created remedy here. *See* Hosp.'s Br. at 25–26. But the Agreement here fails to list *any* remedies available to the Union for a violation of Section 3.04. Notably, cease-and-desist is not even included as an explicit remedy to cure Grid violations, *see* Agreement §§ 3.04, 14.07. It is true that in a May 2025 arbitration between the Hospital and Union concerning the same Agreement, a different arbitrator found that the Union's injury could not be remedied beyond a cease-and-desist. *New York-Presbyterian Hosp. v. New York State Nurses Ass'n*, (May 23, 2025) (Lowitt, Arb.) ("I . . . believe I remain constrained by the specific language of the contract . . . which does not provide for any actual remedy other than a cease and desist."). It is also true, however, that yet another arbitrator found that damages *were* warranted for a violation of a similar agreement. *See N.Y.P. I*, 2024 WL 5107586, at *2–3 ("The Arbitrator . . . rejected the Hospital's argument that a monetary remedy to nurses working on an understaffed shift was punitive. Instead . . . it was designed to compensate the nurses for working under the adverse conditions of caring for more patients than would usually be assigned."). Although arbitrators have come down on different sides of the issue, the Court here finds the Hospital's insistence on cease-and-desist as the only conceivable remedy unpersuasive. As long as the Award "draws its essence from the collective bargaining agreement,"

as it does here, "it must be confirmed." *Id.* (quoting *Niagara Mohawk I*, 143 F.3d at 714).

Finally, the Hospital argues that affirmative "enforcement provisions," which authorize remedies beyond cease-and-desist, can be found in the Union's collective bargaining agreements with other hospitals, underscoring that the absence of such a provision here reveals that it was not available to the Arbitrator. *See* Hosp.'s Br. at 10. This argument too falls short. Here, the "Arbitrator correctly looked to the Agreement that was presently before [him]," *N.Y.P. I*, 2024 WL 5107586, at *6, just as he was obligated to do.

Accordingly, the Court concludes that the Arbitrator did not exceed his authority under the Agreement.

### III. Whether the Award Was Irrational

The Hospital's final argument as to why the arbitral award cannot stand is that it is an irrational remedy that "compounds [its] staffing issues," Hosp.'s Br. at 29, and is not rooted in the Agreement. Rather than remedying staffing shortages, the Hospital says the Award would create "140 additional shifts," that needed to be filled. *Id.* Additionally, since the Grid in the Allen ED does not account for patient volume, the Hospital asserts that "[n]o individual nurse can say that she worked harder, or less hard, on any particular day simply because of the number of nurses who appeared for their shift." *Id.* at 30. Therefore, it urges the Court to hold that a remedy that tried to account for overstaffing was without a "textual touchstone," and so irrational as to warrant vacatur. *Id.* The Court disagrees.

While grounds to vacate an arbitral award on the basis of irrationality exist, they are rooted in state law. *See* NY CPLR § 7511(b). As a result, courts in this district have repeatedly held that Section 301 of the LMRA "completely preempts," state law claims moving to vacate arbitral awards for irrationality. *Collaku v. Temco Service Industries, Inc.*, No. 18-CV-4054, 2019 WL

18

452052, at \*5 n.5 (S.D.N.Y. Feb. 5, 2019) ("[F]ederal common law displaces New York law with regard to the arbitrator's duties and obligations."); *see also Loc. 794, Television Broad. Studio Emps. Union, I.A.T.S.E. v. Metro. Opera Ass'n*, No. 21-CV-3821, 2022 WL 992830, at \*3–4 (S.D.N.Y. Mar. 31, 2022). Irrationality, standing alone, is thus typically not a ground for vacatur for an arbitral award in federal court.

Preemption aside, the Court returns to the critical question, namely "whether the Award draws its essence from the collective bargaining agreement." *See N.Y.P. I*, 2024 WL 5107586, at \*7. While the Court appreciates the Hospital's concern that the Award further exacerbates its staffing shortages, Hosp.'s Br. at 29, the Second Circuit has been clear that "courts are not permitted to substitute" their own "view of the facts and the meaning of the contract for which the parties bargained." *Nat'l Football League Mgm't Council*, 820 F.3d at 536. In concluding that "[d]ue to the unique patient flow and unequal, irregular, and unusual staff assignments on this unit, the appropriate remedy is three vacation days for each full-time regular Allen ED RN," Award at 54, the Arbitrator provided "at least a barely colorable justification," for the Award. *N.Y.P. I*, 2024 WL 5107586, at \*7.

The Court lastly rejects the Hospital's contention that the Award is irrational because the Grid did not contain "ratios for nurse staffing" based on the number of patients and the "degree to which nurses are relatively 'overworked' cannot be abstractly determined," making an Award that pledges to remedy such overwork too nebulous. Hosp.'s Br. at 29–30. The Arbitrator, however, made clear how he arrived numerically at the Award and grounded it in the Agreement. *See* Award at 54–55. While it is true that the Award is not mathematically calibrated to each nurse's workload during understaffed shifts, every nurse who was a recipient of the Award suffered to some degree as a result of the Hospital's violation of the Agreement. As a result, the Award "cannot be said to

conflict with any express terms or the 'essence' of the Agreement to an extent that would require vacatur." *N.Y.P. I*, 2024 WL 5107586, at * 8. It is thus not irrational. Having found that the Hospital did not establish a basis on which to vacate the Award, the Court denies the petition.

### IV. Cross-Motion to Confirm the Arbitration Award

"Due to the parallel natures of a motion to vacate and a motion to confirm an arbitration award, denying the former implies granting the latter." *See L'Objet, LLC v. Ltd.*, No. 11-CV-3856, 2011 WL 4528297, at *3 (S.D.N.Y. Sept. 29, 2011); *see also Elwell v. Raymond James Fin. Servs., Inc.*, 686 F. Supp. 3d 281, 294 (S.D.N.Y. 2023) (same). As explained above, since the Hospital did not provide a valid reason to vacate, modify, or correct the arbitration award, the Union's cross-motion to confirm the Award is granted. *See Shenzhen Zongheng Domain Network Co., Ltd. v. Amazon.com Servs. LLC*, 2023 WL 7327140, at *7 (S.D.N.Y. Nov. 7, 2023) (granting cross-motion to confirm arbitration award after denying petition to vacate).

### CONCLUSION

For these reasons, the Hospital's motion to vacate the Award is denied and the Union's cross-motion to confirm the Award is granted. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 4 and 14 and close this case.

SO ORDERED.

Dated:   September 30, 2025
         New York, New York

 _____
 Ronnie Abrams
 United States District Judge